In the Matter of JACOB ZELLNER, Appellant. BROOKLYN TRUST COMPANY, as Trustee for Certificate Holders of BOND AND MORTGAGE GUARANTEE Co., Respondent.

Argued February 23, 1949; decided May 26, 1949.

*Armende Lesser* for appellant. I. The rental charged for the leasehold is unjust, unreasonable and oppressive and is in excess of the emergency rent required to be paid by chapter 3 of the Laws of 1945. II. The allowance of a managing agent's fee by the Appellate Division is not supported by the record. III. The additional allowance of 15% is contrary to the statute. (*Matter of Frankel* [*Hatters' Oakhide Boxes*], 269 App. Div. 531.)

*Henry J. Walsh, Jr.,* and *Walter F. O'Malley* for respondent. The finding made by the Appellate Division as to the fair rental to be charged does not violate the statute. (*Schack* v. *Handel,* 271 App. Div. 1.)

LEWIS, J. This is a proceeding by a tenant to fix emergency rent under the provisions of section 2, subdivision (e), chapter 3 of the Laws of 1945 (McKinney's Unconsol. Laws, § 8522, subd. [e]), known as the Commercial Rent Control Law.

The proceeding was initiated by an order to show cause dated February 27, 1945, returnable at Special Term, Kings County. Subsequently the report of a referee — which made no specific findings — was confirmed by Special Term, but reversed by the Appellate Division and remitted to Special Term with instruc-

tions to make a decision and to indicate the findings upon which it was made. (270 App. Div. 941.) Upon that remission Special Term again referred the proceeding to a referee whose report was modified by Special Term and, as so modified, was confirmed. Upon cross appeals the Appellate Division modified the order of Special Term — making a new finding of fact and reversing all inconsistent findings — and, as so modified, the order was unanimously affirmed. (273 App. Div. 906, 907.) The proceeding is here on appeal by the tenant only from the order of the Appellate Division.

On December 15, 1944, the respondent, Brooklyn Trust Company, as trustee for mortgage participation certificate holders, while operating the building in suit under an assignment of rents, leased the premises to the petitioner-appellant for a term of five years from January 1, 1945, at an annual rent of $5,400. Under that lease the tenant was obligated to make necessary repairs. As the lease was made on December 15, 1944 — prior to the enactment of the Commercial Rent Control Law (L. 1945, ch. 3) — no question arises as to an intentional evasion of that statute. On December 30, 1944, respondent acquired the fee by deed in lieu of foreclosure, which deed expressly negatived merger of the mortgage in the fee. Shortly thereafter, the Commercial Rent Control Law became effective and thereupon petitioner instituted this proceeding based upon the claim that the rent reserved in the lease was in excess of the emergency rent permitted by the statute.

The Commercial Rent Control Law (L. 1945, ch. 3, § 2, subd. [e]) — which was in effect without amendment at the time this proceeding was instituted — defines " emergency rent " as " The rent reserved or payable under any lease, agreement or tenancy of commercial space in force on March first, nineteen hundred forty-three, plus fifteen per centum of such rent; *provided that if the commercial space was not used or occupied on such date for commercial purposes, the emergency rent shall be the reasonable rent therefor as of such date, plus fifteen per centum thereof, to be fixed* by agreement, by arbitration, or *by the supreme court upon the basis of* the rent charged on such date for the most nearly comparable commercial space in the same building or *other satisfactory evidence.*" (Emphasis supplied.)

The property here involved is located at 94–100 Putnam

Avenue in Brooklyn and consists of a corner lot entirely occupied by a four-story building which is about fifty years old and in a state of poor repair. On March 1, 1943 — the controlling date of the statute quoted above — the building was occupied by the then owner and was operated as a garage.

It thus appears that on March 1, 1943, the building was producing no rent which could serve as a base for determining emergency rent under the statute and, accordingly, that part of the statutory definition of " emergency rent " found in subdivision (e) of section 2 quoted (*supra*) — viz. " rent reserved \* \* \* plus fifteen per centum of such rent " — does not apply. Nor is the remaining language of that section precisely applicable to controlling facts in this case because, although the building was used on March 1, 1943, for a commercial purpose (subd. [b] *id.*), it was not then rented. However, the Justice at Special Term ruled that the word " used ", as it appears in the statute, should be construed to include " rented ", and that accordingly the latter part of the section is applicable. Furthermore, since the lease here involved covered the property in its entirety, there is no " comparable commercial space in the same building " (§ 2, subd. [e] *id.*) producing rent which would serve as a factor to be considered in determining " emergency rent."

It was in those circumstances that the Justice at Special Term adopted the course now challenged by the appellant but which has met with the approval of the Appellate Division and which we now approve. Mindful that the statute (§ 2, subd. [e] *id.*) directed that " the emergency rent shall be the reasonable rent therefor as of such date [March 1, 1943] " and relying upon the authority expressly given by that statute to the Supreme Court to use " *other satisfactory evidence* " as a " basis " for determining " emergency rent ", the Justice at Special Term turned to the method of fixing " reasonable rent " as set forth in section 4 of chapter 3 of the Laws of 1945 (as amd. by L. 1945, ch. 315 — and see McKinney's Unconsol. Laws, § 8524). That section provides in part: " In the determination of the amount of such reasonable rent: (a) due consideration shall be given to the cost of maintenance and operation of the entire property (including land and building in which such commercial space is located) including amounts paid for taxes assessed against such property, and to the kind, quality and quan-

tity of services furnished, but excluding amortization or interest paid or accrued on any incumbrances thereon * * *. A net annual return of six per centum on the fair value of the entire property including the land plus two per centum of principal for amortization of any mortgages thereon shall be presumed to be a reasonable return. The assessed valuation of the entire property, including land and building, as shown by the latest completed assessment-roll of the city, shall be presumed to be the fair value of the premises, but other lawful evidence of the fair value may be offered and received." To the "reasonable rent" so derived *as of March 1, 1943* — not as of the date the application was made — Special Term added 15% as expressly authorized by subdivision (e) of section 2 of chapter 3 of the Laws of 1945 (quoted *supra*) to arrive at the "emergency rent" prescribed by law.

Our thought is that in the circumstances disclosed by this record the process by which the courts below determined the appropriate emergency rent was permissible within the unequivocal language chosen by the Legislature to express its purpose and the means by which that purpose may be accomplished. We may assume that by expressly authorizing the Supreme Court in its discretion to use "other satisfactory evidence" (§ 2, subd. [e] *id.*) as a basis for determining emergency rent, the Legislature intended that phrase to serve some purpose. (*People* v. *Dethloff*, 283 N. Y. 309, 315; *Allen* v. *Stevens*, 161 N. Y. 122, 145; *Palmer* v. *Van Santvoord*, 153 N. Y. 612, 616.) We cannot say as a matter of law that the purpose served in this instance by the authorized use of "other satisfactory evidence" to determine emergency rent was not within the Legislature's intent.

With the exception of one item, to which reference will presently be made, we conclude that the order of the Appellate Division does not transcend authority granted by the statutes cited above. That order modified the order of Special Term on the law and the facts by striking out $5,140.79 as the total emergency rent fixed by Special Term and inserting in its place $5,334.85. The items which comprise the total figure last mentioned above and the computation by which that figure is reached are set forth in the following new finding made by the Appellate Division: " ' The proper items and amounts to be taken into consideration

as cost of maintenance and operation are, taxes, $1,550.50; insurance, $418.50; and managing agent, $270, making a total of $2,239, to which should be added the sum of $2,400, representing six per centum of $40,000, the value of the property, making a total of $4,639, fifteen per centum of which, or $695.85, should further be added thereto, making a total of $5,334.85.' '' (273 App. Div. 906, 907.)

The above items which the Appellate Division found to be properly included within the cost of maintenance and operation of the building do not include a trustee's fee of $96.25 which Special Term had ruled should be so included. We disregard that omission in view of the fact that upon the present appeal neither party has made reference to it.

There remains for consideration, however, the appellant's challenge to the new finding by the Appellate Division insofar as it includes a managing agent's fee in the amount of $270 as an appropriate item of cost of maintenance. That item being one not found by the Justice at Special Term, we have reviewed the facts relating thereto. (Civ. Prac. Act, § 605; *Harrington* v. *Harrington,* 290 N. Y. 126, 130.) As to that item our conclusion is that the weight of evidence fails to establish that the respondent landlord actually maintains a managing agent whose functions relate to this particular property of which the plaintiff leases the entire building and as to which he is required to make all repairs at his own cost.

The order of the Appellate Division should be modified by striking the item " managing agent, $270 " from those items set forth in the new finding by the Appellate Division to be taken into consideration in ascertaining the cost of maintenance and operation of the property in suit, and the computation by which the total emergency rent is determined should be modified accordingly, and as so modified the order should be affirmed, with costs to the appellant.

FULD, J. (dissenting). The Commercial Rent Law sets up in different sections two distinct procedures for determining and computing the amount of rent which a landlord of commercial space is entitled to receive during the war-created emergency (L. 1945, ch. 3, § 2, subd. [e]; § 4; McKinney's Unconsol. Laws, § 8522, subd. [e]; § 8524), one for the purpose of determining the

" emergency rent " (§ 2, subd. [e]), and the other for the purpose of ascertaining the " reasonable rent ", a rent, the statute specifies, " exceeding in amount the emergency rent " (§ 4). The two procedures — as well as the elements to be considered under each — are obviously not meant to be interchangeable, dealing as they do with entirely different aspects of the commercial rent control problem.

In spite of the patent attempt by the Legislature to make the distinction plain, the lower courts have, in a proceeding under section 2 (e) to fix the emergency rent, imported and assimilated into that section the formula and the standards set up in section 4. In approving that procedure, this court is not, I very much fear, paying sufficient heed to the fact that the Legislature has defined the section 4 reasonable rent as one " exceeding " in amount the section 2 (e) emergency rent. In consequence, the " emergency rent " has been fixed at an amount which is equivalent to 115% of the concededly larger " reasonable rent ".

Analysis of the statute illumines the error. Section 2 (e) allows a landlord to collect an " emergency rent ", arrived at by taking the rent charged for the premises on the freeze date, March 1, 1943, and adding to it 15%. The determination of an emergency rent is thus a mere mathematical computation. To take care of those instances in which the premises were not used or rented for commercial purposes on that date — with the result that no specific rental charge is available — the same section provides that the emergency rent be fixed at 15% above an estimated figure, which is called the " reasonable rent " for the premises. Parenthetically, it is the use of the word " reasonable " therein that is responsible for the confusion that has arisen. This section 2 (e) reasonable rent is to be computed by looking to the rent charged on the freeze date for the most nearly comparable space " in the same building " or, where that is impossible, as it true here, by referring to " other satisfactory evidence."

Nothing in section 2 (e) tells us, it is true, what is to constitute such " other satisfactory evidence " of reasonable value. But it is clear, from the statute's design, its structure and its language, that the phrase refers to such evidence as will tend to establish the actual *market value* of the rented space as

of March 1, 1943. That was a date when — section 1 of the statutes indicates — competitive conditions and free bargaining were still reflected in the rental market, and when rents were presumably neither unjust nor oppressive. The Legislature evidently believed that such figures afforded a valid basing point for emergency rent, but, cognizant of the general increase in price levels between the freeze date and the date of the statute's enactment in 1945, it went on to provide that 15% was to be added to either the reserved rental, or to the figure approximating that amount, namely, the reasonable rent. The figure thus derived, the emergency rent, was to be allowed without regard to the landlord's peculiar circumstances and costs or to the income from his property. It was neither designed to reflect the landlord's needs nor to assure him any minimal return on his investment.

Then, desirous of alleviating hardship when the " emergency rent " as thus computed operated unfairly in particular cases because of greatly and disproportionately increased costs of operation, the Legislature wrote section 4 into the statute. (See *Matter of Fifth Madison Corp.* [*New York Tel. Co.*], 297 N. Y. 155, 161.) The basic scheme of that section was to permit the landlord a fair net return — presumptively, 6% — on his investment, by taking into account his own individual problems, such as costs of operation and of maintenance, taxes and mortgage debts. That this is true — that the reasonable rent of section 4 is to reflect a *return on investment* and *not the market rental value* of the premises — is readily ascertainable from the language of the section itself. In so many words, it provides that, upon proper showing, a landlord may obtain a " reasonable rent ", a rent " exceeding in amount the emergency rent " fixed under section 2 (e), i.e., one designed to assure him a " reasonable return." Thus, section 4 declares that " A rent, exceeding in amount the emergency rent, may * * * be fixed * * * by the supreme court. The rent to be so fixed shall be a reasonable rent based on the fair rental value of the tenant's commercial space as of the date the application to the supreme court * * * is made. In the determination of the amount of such reasonable rent: (a) due consideration shall be given to the cost of maintenance and operation of the entire property * * * taxes * * * and to the kind.

quality and quantity of services furnished * * *. A net annual return of six per centum on the fair value of the entire property including the land plus two per centum of principal for amortization * * * shall be presumed to be a reasonable return.''

It impresses me as self-evident that the basic and vital differences between the standards prescribed by section 2 (e) and those prescribed by section 4 preclude resort to the latter's '' net annual return '' formula in a proceeding to determine emergency rent under section 2 (e). Such a process would in no wise assure a rental based, as section 2(e) contemplates and requires, on the freely-bargained rental rates prevailing on the freeze date, plus 15%, and, indeed, to employ the same might well yield the highly anomalous and unfair result of permitting the landlord to obtain as emergency rent — under section 2 (e) — an amount 15% higher than he could possibly have obtained as reasonable rent under section 4, which by definition is to exceed the emergency rent. It would require the court to start with a greater figure and add thereto in order to reach a smaller figure.

Mere statement demonstrates the impropriety of that procedure and the use of a few equations points it up beyond dispute. If the section 2 reasonable rent equals '' $RR^2$ '', and its emergency rent equals '' ER '', then, under section 2 (e),

$$RR^2 + 15\% = ER.$$

And, if the section 4 reasonable rent equals '' $RR^4$ '', and the increase necessary to insure the landlord's desired fair return (designated as reasonable rent), equals '' X '', then, under section 4,

$$ER + X = RR^4.$$

Now, in the case before us — wherein we are seeking '' ER '' — the courts below have taken '' $RR^4$ '' and added to it 15%. What has been done is graphically reflected by the following equation:

$$ER = RR^4 \text{ (which equals } ER + X) + 15\%.$$

It requires no mathematician, no logician, to recognize that there must be a flaw in the process which produces such a result. The reasoning employed disregards the legislative design and plan embodied in section 4. It overlooks the definition of reasonable rent in that section as a figure '' exceeding in amount the

emergency rent '' and incorrectly uses that figure as the core and foundation in computing the emergency rent under section 2. But it does not stop there; it then compounds the error by adding 15% more to the already oversized starting sum. Such a result, it is plain, was and can be achieved only by misconstruing the statute's language, only by upsetting the Legislature's design.

It is no answer that the courts below applied the formula under section 4 as of March 1, 1943, rather than as of the date of the application. March, 1943, was deep within the war period; operating expenses, taxes, and other costs may have been as inflated and abnormal on that date as they were on the date of petitioner's application. The vice involved in using the section 4 formula in any manner, in connection with a section 2 (e) proceeding to fix the emergency rent, is that, although the statute permits but 15% to be added to the March 1, 1943 reasonable rent, use of that formula will frequently yield a figure in excess of that.

For these reasons, the criteria and formula contained in section 4 cannot correctly be used and received as '' other satisfactory evidence '' of March 1, 1943 rental values in a proceeding brought under section 2 (e). To put it shortly, the data which section 4 refers to are no more applicable in computing the section 2 reasonable rental value of the premises on March 1, 1943, than they are indicative of the rent actually reserved in a lease in force on that date.

The '' other satisfactory evidence '', contemplated by section 2, may, of course, be furnished in a number of ways — and I but suggest expert testimony as to prevailing rates for equal amount of space in similar neighborhoods and comparable buildings. Such evidence, and other facts bearing on the issue of market value on the freeze date, would undoubtedly come forth if another hearing were to be held.

In my judgment, the order of the Appellate Division should be reversed and the matter should be remitted to Special Term for a determination of the '' emergency rent '' upon the basis of criteria which are proper under subdivision (e) of section 2 of the Commercial Rent Law.

CONWAY, DYE and BROMLEY, JJ., concur with LEWIS, J.; FULD, J., dissents in opinion in which LOUGHRAN, Ch. J., and DESMOND, J., concur.

Ordered accordingly.